IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RICHARD RIVAS, ) <br> ) <br> Petitioner, ) <br> vs. ) <br> ) <br> DORA B. SCHRIRO, ET AL., ) <br> ) <br> Respondents. ) <br> ) | No. CV 05-434-PHX-DGC (BPV) <br><br> **REPORT AND RECOMMENDATION** |

On February 5, 2005, Richard Rivas, ("Petitioner"), an inmate confined by the State of Arizona, filed a *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody, pursuant to Title 28, U.S.C. § 2254 ("Petition"). Respondents filed an Answer ("Answer") to the Petition on May 19, 2005, with exhibits A through EEE attached. Petitioner filed a reply on June 17, 2005.

Pursuant to the Rules of Practice of this Court, this matter was referred to Magistrate Judge Bernardo P. Velasco for a Report and Recommendation.

On June 17, 2005, Petitioner also filed a Motion for Summary Judgment and a Motion for Appointment of Counsel which this Court addresses in a separate Order.

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an order dismissing the Petition

**FACTUAL AND PROCEDURAL BACKGROUND**

Petitioner, Richard Steven Rivas III, along with a co-defendant, James Anthony Sanchez, was indicted in the Superior Court of the State of Arizona, in Maricopa County, on November 30, 1995, for First Degree Murder for the death of Harold Bone on November 23, 1995; and Attempted Murder First Degree for the attempted murder of Randal Palmer. (Answer, Ex. R.) Petitioner was also indicted for Possession of

1 Narcotic Drugs. (*Id*) The matter was apparently remanded to the Grand Jury, and an
2 indictment was returned on March 1, 1996, charging Petitioner alone with the above
3 offenses. (Answer, Ex. R.)

4       The trial court denied a motion to consolidate the trial of Petitioner and James
5 Sanchez, and further severed the Petitioner's narcotics offense from the murder and
6 attempted murder offenses. (Answer, Ex. S.) The narcotics offense was eventually
7 dismissed. (Answer, Ex. OO.)

8       On December 15, 1998, Petitioner was tried before a jury on one count of First
9 Degree Murder, a Class One Felony, and one count of Attempted First Degree Murder,
10 in the Superior Court for the State of Arizona, Maricopa County. (Answer, Ex. C.) On
11 January 11, 1999, Petitioner was found guilty of both counts, and the jury found the
12 offenses to be of a dangerous nature. (Answer, Ex. FF.) On July 10, 2001, the trial
13 court sentenced Petitioner to a natural life sentence on the first count with no possibility
14 of parole, and a sentence of 21 years on the second count, to run consecutively.
15 (Answer, Ex. RR.)

16 *Testimony*

17       The facts as developed at trial are as follows:

18       Blair Taylor testified that he was present at the Hi-Liter bar on November 22,
19 1995, along with two friends, Chad Langdon and Randy Grubin. (Answer, Ex. D, p.
20 40-41.) While at the bar, he noticed a man walk past his table, stop at a table next to his,
21 stare at a man at that table wearing a Hawaiian shirt, and then return to his seat. (*Id*, p.
22 44.) This happened three to five times. (*Id* at 45.) He identified the man who kept
23 walking past him as the defendant at the trial. (*Id* at 44.) Mr. Taylor testified that the
24 man walking past was wearing a ball cap with the name "Rivas" in Gothic lettering on
25 the side of the hat. (*Id* at 44-45.) Mr. Taylor, along with his friends, left the bar close
26 to closing time, and while in the parking lot heard a couple of gunshots. (*Id* at 47.) He
27 saw two Hispanic individuals coming from the north side of the parking lot and two
28

1  other individuals standing next to a parked vehicle that was close to the entrance of the
2  parking lot. (*Id* at 47.) The first man walking toward the men by the car had his arm
3  raised, and appeared to be carrying a small chrome or nickel plated revolver. (*Id* at 48.)
4  Mr. Taylor saw him fire a couple shots from the weapon; he observed the muzzle flash
5  from the revolver. (*Id* at 49.) The other man was walking a half-step behind the first
6  man, and had his arm raised also, but Mr. Taylor's view of this man was concealed by
7  the other individual shooting the weapon. (*Id* at 49-50.)   Mr. Taylor identified the man
8  he saw shoot the weapon as the defendant in court. (*Id* at 50.)  Mr. Taylor, a firearm
9  enthusiast, was of the opinion that the weapon he saw was a short-barreled revolver,
10 chrome or nickel plated, .38 or .357. (*Id* at 51.)  All together, including the shots he
11 saw fired, he heard a total of seven or eight gunshots. (*Id* at 51.)

12        After the two attackers left, Mr. Taylor, who had been hiding behind a truck,
13 checked to make sure 911 had been called, and then went to check on the victims. (*Id*
14 at 51-53.)  One of the victims appeared to have been shot in the head but was walking
15 around, and the other man was lying on the ground. (*Id* at 53.)  Mr. Taylor recognized
16 the man on the ground as the man with the Hawaiian shirt he had seen earlier in the bar.
17 (*Id* at 53-54.)

18        When the police arrived, Mr. Taylor informed them that the attackers had
19 reentered the bar, and, at that point, the police officers separated Mr. Taylor and his
20 friends. (*Id* at 55.) Later, the police officers asked Mr. Taylor if he could identify two
21 individuals that they had detained. (*Id* at 56.)  Separately, Mr. Taylor identified both
22 of the individuals as the two that attacked the victims. (*Id* at 57-60.)

23        Randy Grubin testifed that he was with Chad Langdon and Blair Taylor at the
24 Hi Liter Bar on Thanksgiving Eve, 1995. (Answer, Ex. E, at 22.)  Mr. Grubin also
25 testified that he was a drug user, and may or may not have been using crystal meth on
26 that particular evening, and since that evening had suffered a heroin overdose. (*Id* at
27 23.)    Les Blake testified that as he was leaving the Hi-Liter bar on the evening of
28

- 3 -

1  November 23, 1995, he heard several gunshots. (Answer, Ex. F, at 117-119.)  After,
2  as he was standing in front of the building, he heard a sound like glass breaking, and
3  saw a gun and someone's hand as it was being used to break the window [of a car]. (*Id*
4  at 120-121.)

5  John Fornes testified that he was present in the Hi-Liter bar when he heard that
6  there had been a shooting. (Answer, Exhibit I. at 16-17.) Mr. Fornes observed two men
7  come back inside the bar. (*Id* at 17.) They were pretty upset and were making a lot of
8  noise. (*Id*) One of the men picked up a table and slammed it back down on the floor
9  and said "I told the guy I would shoot him, and I shot him." (*Id* at 17-18.) The man
10 who slammed the table down and made that statement was wearing a black trench coat.
11 (*Id* at 18.)

12 On cross-examination by the State, however, Mr. Fornes revealed that he
13 believed that both men were wearing black trench coats. (Answer, Ex. I, at 25.) Mr.
14 Fornes acknowledged that he had been interviewed by a police officer the evening of
15 the shooting, and, after reviewing the police report, acknowledged that the police report
16 did not indicate that he told the police officer that day anything about any statement that
17 either man might have made in the bar. (*Id* at 27-28.)

18 Edward Rizo, a police officer for the City of Phoenix testified that he was
19 dispatched to the Hi-Liter bar on November 23, 1995, at approximately 1:00 in the
20 morning. (Answer, Ex. D, at 92.)  Once inside the Hi-Liter bar, Officer Rizo took the
21 defendant into custody, without incident. (*Id*, at 93-94, 99.)

22 Officer Eric Reed, Police Sergeant for the City of Phoenix testified that
23 sometime after one o'clock in the morning on November 23, 1995, he responded to the
24 Hi-Liter lounge. (*Id* at 110.) Officer Reed and another police officer immediately went
25 into the lounge. (*Id* at 111.) His attention was directed to one of the subjects inside the
26 bar wearing a long, dark coat, who stood up and began to walk away from him. (*Id* at
27 113.) Officer Reed ordered him to stop. (*Id*) The subject became irate, turned around
28

1  and whipped off his coat. (*Id*)  Officer Reed ordered him to the ground, and, after
2  several commands, he did so and was taken into custody. (*Id* at 113 - 114.) The subject
3  who was apprehended by Officer Reed was not the defendant in this case. (*Id* at 116.)
4        Stephanie Gutierrez testified that around the time of Thanksgiving, 1995, she had
5  a relationship with Richard Rivas, and was pregnant with his child. (Answer, Ex. E.,
6  at 6.) The day before Thanksgiving, 1995, he came over to her house with someone by
7  the name of James to borrow her red Hyundai Excel. (*Id*) When she got the car back
8  two to three weeks later, the driver and passenger side windows were broken. (*Id* at 8.)
9  Ms. Gutierrez testified that the car had transmission problems, and was hard to get in
10 reverse. (*Id* at 7.)  The night of the investigation, the Red Hyundai had been left near
11 the scene with the keys in the ignition. (*Id* at 73-74.)
12       Kenneth Hansen, an investigator with the City of Phoenix Police Department,
13 testified that he was called to the Hi Liter Bar on November 23, 1995, and arrived
14 around 2:30 in the morning. (*Id* at 9-10.) Detective Hansen was the case agent
15 assigned to the case and conducted the witness one-on-one identifications at the scene.
16 (Answer, Ex. E., at 10-11.) Detective Hansen also observed and directed photographs
17 to be taken of fresh cuts on the Petitioner's hands (Answer, Ex. G. at 14.)
18       Detective Hansen was unable to find the murder weapon while they were
19 investigating the scene the night of the shooting. (Answer, Ex. E, at 49.)  When
20 Detective Hansen returned to the scene after the sun was up, he found a nickel-plated
21 or chromed stainless steel .357 revolver at the base of a bush roughly 10 feet from the
22 front end of where the red Hyundai had been parked. (*Id* at 52.)
23       Detective Hansen took Mr. Taylor outside of the Hi Liter bar for a one-on-one
24 identification of James Sanchez, and Mr. Taylor said that "he was one of them" and that
25 initially he had a long, dark coat on, like a trench coat. (*Id* at 63.) After viewing the
26 defendant, he also stated that he was "one of them," but that he thought that James
27 Sanchez could have been the person that did the shooting. (*Id* at 64.)
28

1    Detective Hansen conducted the same viewing with Mr. Grubin, and with
2 regards to Mr. Sanchez he said "looks like the shooter." (*Id* at 65.)  With regards to the
3 defendant, Mr. Grubin said he was one of the two individuals he saw at the time of the
4 shooting. (*Id* at 66.)  Mr. Grubin described the shooter as wearing a dark-colored ball
5 cap, backwards, and a dark-colored, plaid type of coat. (*Id* at 73)
6    Detective Armando Saldate, III, with the City of Phoenix Police Department,
7 testified that he and two other detectives went to speak with James Anthony Sanchez
8 on December 29, 1998, at the Madison Street Jail. (Answer, Ex. I., at 37-39.)  During
9 the course of an unrelated conversation, the name of the Defendant in this case, Richard
10 Rivas, came up. (*Id* at 39.)  Sanchez responded to a question with "Hell, yes, Richard
11 killed — killed that guy.  I may have knew the guy.  I may have knew the guy, but I
12 didn't kill him." (*Id* at 39.)  James Anthony Sanchez testified and denied making the
13 statement. (*Id* at 58.)
14    The parties stipulated that Mr. Sanchez was convicted of a felony in Arizona in
15 1987. (Answer, Ex. CC.)  The parties also stipulated that prior to the homicide of Mr.
16 Bone, Mr. Sanchez was a defendant in a criminal trial wherein Mr. Bone testified
17 against Mr. Sanchez. (*Id*)  A mistrial was declared and the case was set for retrial. (*Id*)
18 Before that case went to trial again, Mr. Bone was shot and killed in the parking lot of
19 the Hi-Liter bar in November of 1995. (*Id*)
20    Melvin Garrett, a firearms examiner working for the City of Phoenix Crime
21 Laboratory, testified that six casings were recovered from the cylinder of the weapon
22 that was found near the Red Hyundai. (Answer, Ex. E, at 164.)  Visually, what
23 appeared to be blood was visible to Garrett on the grip and the cylinder of the gun, and
24 this was verified through chemical testing. (*Id* at 166-67.)
25    Garrett testified that one bullet that was retrieved from Harold Bone's abdomen
26 was consistent with the gun retrieved from near the red Hyundai, meaning that it is
27 likely that the bullet came from that gun. (Answer, Ex. F. at 18.)  A second bullet
28

1 retrieved from Harold Bone's arm was certain to have been fired from that revolver. (*Id*
2 at 20.)

3        Garret further testified that inspection of smokeless gunpowder on Petitioner's
4 clothing revealed that he had been in proximity or had been the shooter during the firing
5 of some gunshot at some time, but not necessarily the revolver in question and not
6 necessarily on the night in question. (*Id* at 32.)

7        Both parties rested.

8        Following closing arguments the jury retired to deliberate. The Petitioner moved
9 for a mistrial which was denied by the court. (Answer, Ex. I, at 100-102.) Among
10 several jury questions that were submitted during deliberations, the jurors submitted a
11 question to the court, essentially asking the court whether it had to find Rivas shot the
12 gun to sustain a guilty verdict. (Answer, Ex. L. at 15-16.) The court, having previously
13 declined an accomplice liability instruction, declined to further elaborate on the
14 instructions and directed the jurors to reread the instructions in their entirety. (*Id* at 18-
15 20.)

16        After further deliberation, the jury found the Petitioner guilty of both offenses.
17 (*Id* at 28-29.) On July 10, 2001, the Petitioner was sentenced to a term of natural life
18 for the murder of Harold Bone and 21 years consecutive to that sentence for the
19 attempted murder offense. (Answer, Ex. RR and P. at 16.)

20 ***Motion for a New Trial***

21        On July 16, 1999, the trial court heard argument on Petitioner's motion for a new
22 trial. (Answer, Ex. N.) The partial basis for this motion was the juror's question
23 regarding whether or not the jury must find that Petitioner shot the weapon that killed
24 Mr. Bone in order to find that the Petitioner "caused" the death of Mr. Bone. (*Id* at 19-
25 20.) Additionally, Petitioner argued that the jury was confused because the preliminary
26 instruction packet contained accomplice liability instructions, because the state had not
27 yet committed to a theory of liability, but, by the time final jury instructions were
28

- 7 -

1  settled, the court refused an accomplice liability instruction because the state had settled
2  on the theory that Petitioner had been the "lone shooter." (Answer, Ex. HH.)

3  On August 14, 1999, the trial court denied the motion, finding that the jury
4  instructions "were sufficient to clearly instruct the jury and to answer the jury's
5  questions." and that the "Defendant has failed to show that any jury confusion was
6  caused by an instruction which was not given." (Answer, PP. at 4.)

*Appeal*

Petitioner filed his notice of appeal on July 13, 2001. (Answer, Ex. UU.) The Petitioner raised the argument that he was entitled to a new trial because "the trial court improperly handled crucial jury questions and gave the jurors the mis-leading impression Rivas could be found guilty even if he didn't shoot the victims. The mishandling of the jury questions violated Rivas's right to due process of law under the 14th Amendment." (Answer, Ex. VV. at 24.)

On July 29, 2003, the Court of Appeals, in a memorandum decision, affirmed the conviction. (Answer, Ex. ZZ.) The appellate court addressed the issue, finding that the jury "essentially asked the court whether it had to find Rivas shot the gun to sustain a guilty verdict." (*Id* at 12.) The appellate court found that the "court's supplemental instruction here, when considered in light of the other instructions, was not error." (*Id* at 14.)

*Motion for Reconsideration*

On August 13, 2003, Petitioner submitted a Motion to Reconsider, arguing under the Due Process Clause of the 14th Amendment of the United States Constitution, that the Court reconsider its decision affirming the conviction, that the Court of Appeals prejudicially erred in determining the facts and law. (Answer, Ex. AAA, At 2.) The motion was denied on August 25, 2003. (Answer, Ex. BBB.)

*Petition for Review*

- 8 -

Petitioner filed a Petition for Review to the Arizona Supreme Court on September 9, 2003. (Answer, Ex. CCC.) Petitioner argued that the jury instructions were ambiguous on a material point of law, and that it was fundamentally unfair, arbitrary and capricious; a violation of due process of law under the 14th Amendment and art. 2 § 4 of the Arizona Constitution; and an abuse of discretion, namely an unreasonable judicial act committed for untenable reasons, for the trial court to fail to address the jury's fundamental confusion over whether Rivas could be convicted if Sanchez pulled the trigger. (Answer, Ex. CC. at 5.)

The Petition for Review was denied without opinion on January 7, 2004. (Answer, Ex. DDD.) The Order and Mandate Issued on February 6, 2004. (Answer, Ex. EEE.)

Petitioner filed the present Petition for Writ of Habeas Corpus on February 5, 2005. (Document # 1)  Respondents filed an Answer on May 19, 2005. On June 17, 2005, Petitioner submitted a "Motion for Summary Judgment," a "Request for Appointment of Counsel," and an "Answer to Respondents Brief."

## DISCUSSION

### Standard of Review

The writ of habeas corpus is available to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The District Courts's standard of review is described as follows:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

- 9 -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## Timeliness

A one year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court. 28 U.S.C. § 2244(d)(1).

## Exhaustion

An application for writ of habeas corpus shall not be granted unless the applicant has exhausted the remedies available in the courts of the State, there is an absence of available State corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1). This requirement of exhaustion is designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512 (1971).

Generally, there are two methods by which a petitioner may satisfy the exhaustion requirement. First, a petitioner may actually exhaust his claims by providing the state court with an opportunity to review the facts and legal theories in a procedurally appropriate manner. In order to actually exhaust his or her claims, a petitioner must fairly present the federal claims to the state courts; this means that a petitioner is required to present the state courts with the same claim he urges upon the

- 10 -

federal courts. *Id*, 404 U.S. at 275-276, 92 S.Ct. at 512. A state court must be alerted to the fact that a petitioner is asserting a claim under the United States Constitution. *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 888 (1995). It is not enough to present the state court with only the facts necessary to state a claim for relief, nor to make a general appeal to a constitutional guarantee as broad as due process. *Gray v. Netherland*, 518 U.S. 152, 163, 117 S.Ct. 2074, 2081 (1996). Mere similarity between claims of state and federal error is also insufficient to establish exhaustion. *Shumway v. Payne*, 223 F.3d 982, 988 (9th Cir. 2000) (citing *Hivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999)). A petitioner must make the federal basis of a claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is "self-evident," or the underlying claim would be decided under state law on the same considerations that would control resolution of the claim on federal grounds. *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), *as modified by* 247 F.3d 904 (9th Cir.2001) (quoting *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999)). In Arizona, "claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them." *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999).

A second form of exhaustion, "technical exhaustion" can be demonstrated by showing either that a state court found a claim defaulted on procedural grounds, or, if the claim was never presented in any forum, that no state remedies remain available to the petitioner. Because the exhaustion requirement refers only to remedies still available at the time of the federal petition, if a petitioner failed to present his claims in state court and can no longer raise them through any state procedure, state remedies are no longer available, and are thus exhausted. *Gray*, 518 U.S. at 161-62, 117 S.Ct. at 2080 (1996); *Franklin v. Johnson*, 290 F.3d 1223, 1231 (9th Cir. 2002) (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28, 102 S.Ct. 1558 (1982)); *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728 (1999). The procedural bar which gives rise to

1 exhaustion provides an independent and adequate state-law ground for the conviction
2 and sentence, and thus prevents federal habeas corpus review of the claim, unless the
3 petitioner can demonstrate cause and prejudice for failing to raise the claims in earlier
4 proceedings. *Gray*, 518 U.S. at 162, 116 S.Ct. at 2080 (citations omitted).

5 If a claim has never been presented to the state court, a federal habeas court may
6 determine whether state remedies remain available[1]. *See Harris v. Reed*, 489 U.S. 255,
7 269-70 (1989); *Teague v. Lane*, 489 U.S. 288, 298-99.

8 Rule 32.1 of the Arizona Rules of Criminal Procedure allows a defendant to seek
9 post-conviction relief on the ground that his conviction was in violation of the
10 Constitution of the United States. Ariz. R. Crim. P. 32.1(a). Arizona Rule of Criminal
11 Procedure 32, however, governs when a petitioner may seek relief in post-conviction
12 proceedings and raise federal constitutional challenges to their convictions or sentences
13 in state court. Under Rule 32.2, relief is barred on any claim which could have been
14 raised in a prior Rule 32 petition for post-conviction relief, with the exception of certain
15 claims which fall under sub-sections (d) through (h) of Rule 32.1, and which were
16 justifiably omitted from a prior petition.

17 Furthermore, Rule 32.4 (a) requires that a petition for post-conviction relief must
18 be filed within 90 days of the entry of judgment and sentence or 30 days after the
19 issuance of the order and mandate in the direct appeal, whichever is the later. See Ariz.
20 R. Crim. P. 32.4(a). Again, the exceptions to this requirement are claims asserted under
21 subsections (d) through (h) of Rule 32.1. Ariz. R. Crim. P. 32.4(a).

---

[1] Although the Ninth Circuit has recently suggested that under Rule 32.2(a)(3), there are exceptions to the rule that a District Court can make such a determination for claims which require a knowing, voluntary, and intelligent waiver, *see Cassett*, v. *Stewart*, 406 F.3d 614, (9th Cir. 2005), this Court does not address such waiver because it has not been affirmatively raised by the petitioner. *See Beaty v. Stewart*, 303 F.3d 975, 987 & n.5 (9th Cir. 2002).

1   Thus, in situations where a petitioner might otherwise attempt to revive an
2 unexhausted federal claim in state court, and the state court might invoke the procedural
3 bars of Rule 32.2 and 32.4(a), Arizona Rules of Criminal Procedure, in rejecting such
4 an attempt, there is an adequate and independent state ground barring Petitioner from
5 raising these claims in state court proceedings thereby creating a procedural default for
6 purposes of federal habeas review.

## ANALYSIS

### Timeliness

9   Respondents do not contest the timeliness of the habeas petition. A review of
10 the petition suggests that it is timely. Respondents concede that the petition is timely.
11 This Court recommends that the District Court find that the Petition is timely filed.

*Ground One*

13   Petitioner argues that the state conviction violates the "Fourteenth Amendment."
14 (Petition, p.5.)

### Exhaustion

16   Respondents argue that Petitioner failed to properly raise the claim presented in
17 Ground I as a federal claim in state court. As noted above, a petitioner must make the
18 federal basis of a claim explicit either by citing federal law or the decisions of federal
19 courts. *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), *as modified by* 247 F.3d
20 904 (9th Cir.2001),quoting *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999).
21 Petitioner must give the Arizona courts "a 'fair opportunity' to act on his federal due
22 process claim before presenting it to the federal courts." *Castillo v. McFadden*, 399
23 F.3d 993 (9th Cir. 2005) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45, 119 S.Ct.
24 1728 (1999); *Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir. 2003) (en banc).
25 Petitioner must apprise the Arizona Courts that he is making a claim under the U.S.
26 Constitution, and describe both the operative facts and the federal legal theory on which
27 his claim is based. *Castillo*, 399 F.3d at 998-99 (citations omitted.)

Petitioner in this case did not explain in his appellate briefing how the mishandling of the jury question violated Rivas's right to due process of law under the Fourteenth Amendment. Petitioner's memorandum was firmly rooted in state based arguments. Although petitioner cited several cases in support of his argument, both state and federal, none of these cases relied upon or made reference to, a due process violation. As noted in *Castillo,* "[e]xhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory." *Castillo*, 399 F.3d at 1003.

The mere mention in passing, as in this case, of a broad constitutional principal such as due process is insufficient to exhaust a federal claim. *See Fields v. Waddington*, 401 F.3d 1018 (9th Cir. 2005) (citing *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (per curiam).

After Petitioner's conviction was affirmed, Petitioner filed a Motion for Reconsideration, arguing that the Court of Appeals failure to consider the impact of Instruction I.252 was a violation of state law and the Fourteenth Amendment of the United States Constitution, and was a basis for the court to reconsider its opinion. (Answer, Ex. ZZ.) Under *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), however, this is insufficient to exhaust the Petitioner's federal claim because it was raised in a procedural context in which it would not be considered absent special circumstances. The Arizona Court of Appeals summarily denied the motion and never reached the merits of any federal issue and the Arizona Supreme Court did the same on review.

Petitioner's claim was never made explicit in a procedurally appropriate manner in state court, and thus Petitioner's claim was not preserved for federal review.

**Jurisdiction**

- 14 -

1    Accordingly, Petitioner failed to exhaust a federal due process claim. The Court
2 need not address whether that claim is procedurally defaulted, however, because
3 Petitioner is actually pursuing a state law claim in his § 2254 Petition. As Petitioner has
4 argued in his appeal, Petitioner again relies on *State v. Ramirez*, 178 Ariz. 116, 126, 871
5 P.2d 237, 247 (1994) and asserts in his Petition that Rule 22.3 of the Arizona Rules of
6 Criminal Procedure expressly provides for supplemental instruction where the jury asks
7 for guidance. (Petition, p.7.) Petitioner makes no new arguments based on federal law,
8 he is simply stating that the Court of Appeals, in addressing the arguments under
9 *Ramirez* and Ariz.R.Crim.P. 22.3, got it wrong and failed to take into consideration the
10 full impact on the jury of instruction 252 when considering whether or not the trial court
11 abused its discretion under *Ramirez*.

12    A habeas corpus petition must allege a deprivation of a federal right to present
13 a cognizable federal habeas corpus claim. A state's interpretation of its own laws or
14 rules affords no basis for federal habeas corpus relief because no federal constitutional
15 question arises. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

16    Accordingly, to the extent that Petitioner challenges the State Court's application
17 of the Arizona Supreme Court's decision in *Ramirez* and the application of Rule 22.3
18 of the Arizona Rules of Criminal Procedure, Petitioner fails to state a cognizable claim
19 and his claim for relief fails.

20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///

27                              **RECOMMENDATION**

1  This Court recommends that the District Court, after its independent review of
2 the record, dismiss this action in its entirety.
3  Pursuant to Title 28 U.S.C. § 636(b), any party may serve and file written
4 objections within 10 days of being served with a copy of this Report and
5 Recommendation. If objections are not timely filed, they may be deemed waived. If
6 objections are filed, the parties should use the following case number: CIV 05-434-
7 PHX-DGC.

9  DATED this 21st day of December, 2005.

_____
Bernardo P. Velasco
United States Magistrate Judge